UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LATESHA K.,[1] | ) |
|           Plaintiff, | ) No. 19 CV 6406 |
| v. | ) Magistrate Judge Young B. Kim |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[2] | ) |
|           Defendant. | ) July 29, 2021 |

**MEMORANDUM OPINION and ORDER**

Latesha K. seeks supplemental security income ("SSI") and disability insurance benefits ("DIB") for a period from August 2008 through December 2010, based on her claim that she was disabled during that timeframe by persistent and severe migraine headaches. In this lawsuit Latesha seeks review of the Commissioner's third decision denying her applications for DIB and SSI. *See* 42 U.S.C. § 405(g). Before the court is Latesha's motion for summary judgment. For the following reasons, the motion is granted:

**Procedural History**

This case has a long and somewhat complicated procedural history, starting when Latesha first filed her DIB and SSI applications in September 2008, claiming

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the claimant's first name and last initial throughout this opinion to protect her privacy to the extent possible.

[2] Kilolo Kijakazi is currently the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), she is automatically substituted as Defendant in this case.

a disability onset date of August 27, 2008. (Administrative Record ("A.R.") 154, 159.) After her applications were denied initially and upon reconsideration, Latesha sought a hearing before an administrative law judge ("ALJ"). The ALJ issued a decision on December 1, 2010, concluding that Latesha was not disabled. (Id. at 29-40.) In April 2012 the Appeals Council declined to review the ALJ's decision. (Id. at 8-10.)

In the meantime, Latesha filed a second set of applications for DIB and SSI, alleging an amended disability onset date of December 2, 2010—one day after the ALJ's first decision finding her not disabled. In October 2012 the ALJ assigned to her second set of applications issued a decision finding that Latesha's pain (including migraines) and obesity resulted in a residual functional capacity ("RFC") so restrictive that she could not sustain any work that exists in significant numbers in the national economy. (Id. at 757-64.) Accordingly, the ALJ concluded that Latesha was disabled as of December 2, 2010, the amended disability onset date. (Id. at 764.)

While the SSA was processing her second, successful set of applications, Latesha filed a federal lawsuit seeking review of what had become the Commissioner's final decision denying her first set of applications. *See Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020) (noting that when Appeals Council declines review ALJ's decision becomes Commissioner's final decision). The case proceeded to the summary judgment stage, where the court affirmed the Commissioner's final decision. (A.R. 701-41.)

Latesha appealed the court's decision and the Seventh Circuit Court of Appeals reversed and remanded the case. (A.R. 691.) The Seventh Circuit faulted the ALJ's handling of the evidence regarding Latesha's obesity and migraines. In particular, it characterized the ALJ's discussion of Latesha's migraines as not being "logically connected" to the RFC determination and noted that the ALJ erroneously seemed to imply that she does not experience headaches at all. (Id. at 696.) The Seventh Circuit took issue with the ALJ's reliance on normal brain MRI findings to reject Latesha's migraine complaints, pointing out that MRIs are used to rule out other sources of headaches, not to diagnose migraines. (Id. at 697.) The Seventh Circuit also took umbrage with the ALJ's statements that Latesha denied headaches to her doctors on one occasion when the records suggest that she denied having headaches only at the time of the appointment and noted that if the ALJ credited Latesha's allegations that migraines kept her bed-bound multiple days per week, she would not be able to sustain full time work. (Id. at 697, 699-700.)

On remand from the Seventh Circuit in May 2015, the ALJ issued a second unfavorable decision, and after that decision became final Latesha again appealed to this court. This time, the government agreed to a voluntary remand. (Id. at 1047.) After reviewing the remand order, the Appeals Council issued a decision in August 2017 directing the ALJ to reevaluate Latesha's symptom statements and mental RFC. (Id. at 1053-54.) The Appeals Council explicitly faulted the ALJ for writing that Latesha repeatedly denied headaches during the relevant period and noted that the ALJ failed to explain how an RFC assessment limiting Latesha to

3

simple tasks, simple work decisions, and occasional changes in work settings accommodates her moderate limitations in concentration, persistence, or pace ("CPP"). (Id. at 1053.)

On January 11, 2018, the ALJ held another hearing at which Latesha, a medical expert ("ME"), and a vocational expert ("VE") testified. (Id. at 909-46.) Following that hearing the ALJ issued a third unfavorable decision concluding that Latesha was not disabled during the relevant period. (Id. at 881-900.) The Appeals Council declined review, rendering the ALJ's third decision final, and Latesha filed this lawsuit seeking judicial review yet again. The parties have consented to this court's jurisdiction. (R. 8); *see* 28 U.S.C. § 636(c).

## Facts

Because Latesha has already been found to be disabled as of December 2, 2010, the relevant period for purposes of the decision under review is August 27, 2008, through December 1, 2010—the date of the first ALJ decision denying benefits. At her January 2018 hearing before the ALJ, Latesha presented medical records and testimony in support of her claim that she was disabled by migraines during the relevant period.

### A. Medical Evidence

In September 2008 Latesha reported to her primary care physician, Dr. William Crevier, that she had a history of migraines stretching back six years. (A.R. at 349.) Dr. Crevier ordered an MRI of the brain, but the results did not identify any cause for Latesha's headaches. (Id. at 335, 350.) In October 2008

4

Latesha returned to Dr. Crevier for evaluation of her migraines. He recorded that she was taking Ultram and Imitrex and although "headache" was listed as her chief complaint, in his review of systems Dr. Crevier wrote that she denied having a headache. (Id. at 343.) The following month Latesha again told Dr. Crevier that her headaches were her chief complaint and that they had persisted for six years and were becoming more frequent despite her medications. (Id. at 397-98.) That same month at an appointment with a consultative examiner, Latesha reported that she suffered from daily headaches lasting from three to four hours up to three to four days a week and that she had experienced migraines for four years. (Id. at 355.)

Two weeks after Latesha's consultative examination a state consulting physician reviewed her file and opined that she should be assessed as having an RFC for sedentary work with certain exertional limits to accommodate her obesity and restrictions with respect to climbing, stooping, and crouching to accommodate her migraines and medications. (Id. at 362-68.) A second consulting physician agreed with those findings. (Id. at 369-71.)

In December 2008 a specialist noted that Latesha had discontinued a particular medication after experiencing worsening migraines. (Id. at 392.) In February 2009 Dr. Crevier again noted that Latesha's chief complaint was migraines while simultaneously recording in his review of systems that she denied headaches. (Id. at 387.) The following month she complained of migraines on a hospital outpatient questionnaire. (Id. at 473.) In August 2009 Latesha reported to

5

a new care provider, Dr. Leon Huddleston, that she suffered from migraines four times a week lasting several hours each time. (Id. at 484.) The following month Dr. Crevier reported that her number one problem was a history of migraines. (Id. at 544-45.)

In December 2009 Dr. Anthony Francis completed a medical interrogatory form reporting that Latesha's chief problem is obesity with other complaints including migraines. (Id. at 427-28.) Dr. Francis wrote that "[t]here is not enough information on the frequency of her migraines to determine how much these contribute to her overall impairment." (Id. at 429.) He also noted that hers was a "difficult case" but opined that Latesha should be able to work at the full sedentary level or greater. (Id.) In February 2010 a psychologist, Dr. J.J. Shin, assessed her as being depressed and having frequent limitations in concentration and moderate limitations in social functioning. (Id. at 503-06.) Dr. Shin opined that Latesha likely would be absent from work more than three times a month. (Id. at 504.) The following month Latesha again complained to Dr. Crevier that she suffered from headaches, and he recorded that she had a history of migraines dating back to 2008 and that her pain medications were not helping. (Id. at 551-52.)

B.  Latesha's Testimony

Latesha testified during the 2008 hearing that she had trouble even with sedentary aspects of her caregiving job because she had trouble concentrating, focusing, and sitting. (A.R. at 918.) When she had to get through a workday while experiencing a migraine it was "excruciating" and "too much," and caused her to feel

6

physically and mentally strained and depressed. (Id. at 919.) Latesha testified that she would have to take breaks or miss work when she had a migraine, resulting in her hours being reduced. (Id.) She also testified that during the relevant period she was having migraines almost daily, they were sometimes so painful she could not move, and she stayed in bed three days each month because of the pain. (Id. at 920, 923.) Latesha testified that Imitrex blunted the migraine pain but only temporarily. (Id. at 923.)

**C.     ME's Testimony**

ME Dr. Huberto Munoz also testified at the hearing, providing an opinion about Latesha's RFC during the relevant period based on his review of her medical records and observations of her testimony. He opined that Latesha had an RFC that allowed for sedentary work with certain limitations including that she could never climb ladders or scaffolds, needed a moderate noise level to accommodate her migraines, and needed to avoid heights, heavy machinery, extreme cold or heat, and vibrations. (A.R. 925-26.) He further opined that the record would not support a finding that she would likely be absent from work. (Id. at 926.) In explaining his opinion, Dr. Munoz testified that in order to find disability, the ALJ would need a description of symptoms with physical exam findings, but that Latesha's records were missing those components or any description of the length, severity, or frequency of her migraines. (Id. at 929-30.)

**D.    VE's Testimony**

The final witness to testify at Latesha's hearing was the VE, who opined that a person with the RFC the ALJ assigned Latesha would not be able to perform Latesha's past work, but that there are three other jobs that exist in significant numbers in the national economy that the hypothetical person could perform. (A.R. 940.)  Those jobs include toy stuffer (24,000 jobs), final assembler (22,000 jobs), and addresser (6,100 jobs).  (Id.)  When Latesha's attorney asked for the source of those job numbers, the VE testified that the U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics national numbers provide SOC codes for jobs that match positions found in O*NET, and that positions that no longer exist are "pared out." (Id. at 942.)  The VE testified that "[m]any jobs are assigned, usually in equal distribution with respect to percentages unless there's known higher frequency for some jobs such as Cashier II." (Id.)

**E.    ALJ's Decision**

The ALJ followed the standard five-step sequence in evaluating Latesha's SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  At steps one and two the ALJ found that Latesha had not engaged in substantial gainful activity during the relevant period and that she suffered from severe impairments in the form of morbid obesity, degenerative changes to the lumbar spine, obstructive sleep apnea, migraine headache disorder, major depression, insomnia, and anxiety. (A.R. 884.) At step three the ALJ concluded that none of those impairments was of listings-level severity but that Latesha had moderate limitations in CPP and interacting

8

with others. (Id. at 887-88.) Before turning to step four the ALJ determined that during the relevant period Latesha had an RFC for sedentary work with additional restrictions including limitations to, as relevant here, simple tasks, simple work-related decisions with occasional changes in the work setting, occasional interaction with co-workers, supervisors and the public, with no exposure to heights or moving mechanical parts, and no more than moderate noise exposure. (Id. at 889.)

In explaining the RFC assessment, the ALJ wrote that he found Latesha's statements about the intensity, persistence, and limiting effects of her symptoms to be inconsistent, noting that the record does not show that she repeatedly complained about migraines or that she experienced daily migraines. (A.R. 890, 892.) In addition to characterizing her complaints of migraines as "infrequent," the ALJ highlighted Latesha's normal brain MRI results—despite the Seventh Circuit's admonition that such evidence is irrelevant—and wrote that she had a good response to migraine medication. (Id. at 892.) According to the ALJ, Latesha only complained of migraines twice after November 2008. (Id. at 894.) The ALJ gave the ME's testimony "great weight," explaining that he is a "seasoned expert" who reviewed the files and heard the testimony and concluded that the ME's opinion is supported by the record showing "conservative treatment and improvement with conservative measures." (Id. at 896.)

Turning to step four, the ALJ concluded that Latesha could not have returned to her past work during the relevant period, but at step five, the ALJ determined that Latesha could have performed the jobs of toy stuffer, final

9

assembler, and addresser. (Id. at 898-99.) Accordingly, the ALJ concluded again that Latesha was not disabled during the relevant period. (Id. at 899.)

## Analysis

In moving for summary judgment Latesha argues that the ALJ committed a number of reversible errors in finding her not disabled during the relevant period. She first argues that the ALJ erred in relying on the ME's testimony, which Latesha characterizes as unreliable. Latesha next argues that the ALJ improperly discounted her subjective complaints and failed to account for her moderate CPP limitations in assessing her RFC. Finally, Latesha argues that the ALJ erred at step five in relying on the VE's testimony, asserting that there is no substantial evidence supporting his opinion with respect to the numbers of jobs available in the national economy for the positions he identified.

In reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). Although this standard of review is deferential and does not permit the court to second-guess the ALJ's weighing of the evidence, the court will reverse where the ALJ's decision rests on "serious factual mistakes or omissions" or where the evidence the ALJ cites does not support his conclusion. *See Beardsley v. Colvin*, 758 F.3d 834, 836-37 (7th Cir. 2014).

**A.     The ME's Testimony**

Latesha first argues that the ALJ erred in assigning "great weight" to the ME's testimony, asserting that the ME's opinion was unreliable because he failed to consider relevant evidence in formulating his opinion. The ALJ explained that he gave the ME's testimony great weight because the ME is a "seasoned expert" and because the ALJ considered his opinion to be consistent with the record, which reflected improvement in Latesha's headaches with "conservative measures," according to him. (A.R. 896.) As Latesha points out, this explanation is problematic at the outset for its failure to consider the regulatory factors applicable to weighing medical source opinions. (R. 16, Pl.'s Mem. at 7-8.) To be sure, when deciding how much weight to afford to an ME's opinion, the ALJ is required to consider the nature of the examining or treating relationship, consistency and supportability of the opinion, and the doctor's specialization. *See* 20 C.F.R. §§ 404.1527, 416.927.[3]

Here the ALJ did not adequately engage with the applicable regulatory factors when weighing the ME's opinion. *See Plessinger v. Berryhill*, 900 F.3d 909, 914-15 (7th Cir. 2018) (faulting ALJ for failing to analyze 20 C.F.R. § 404.1527 factors in connection with ME opinion). For starters the ALJ called the ME a "seasoned expert," but there is no evidence that he specializes in migraines. As to the supportability of the ME's opinion, had the ALJ considered this factor he would have been forced to reckon with the mismatches between the ME's testimony and the record evidence. The ME testified that to establish disability Latesha needs to

---

[3] These regulations apply to claims, like Latesha's, that were filed before March 27, 2017.

11

provide a description of her symptoms, objective findings from physical examinations, an "assessment" or "analysis" of her condition, and evidence of treatment. (A.R. 929.) The ME then testified that only the "treatment" element exists in the record, and that the record is devoid of any description of the frequency, severity, or length of her headaches. (Id. at 929-30.) Adding confusion, he later testified that "[s]he [does] not [have] migraine based on the record." (Id. at 934.) In so finding, the ME ignored a swath of evidence showing Latesha's long history of migraines.

As the Seventh Circuit already made clear in this case, Latesha has presented an undisputed record of years of migraines, including during the relevant period. (Id. at 696.) As for a lack of objective findings from physical examinations, the ME did not explain how a physical examination would reveal details with respect to Latesha's headaches or what objective evidence he would expect to find that is missing from the record. *See Overton v. Saul*, 802 Fed. Appx. 190, 192 (7th Cir. 2020) ("[T]here is no objective measure for migraine symptoms."). Moreover, contrary to the ME's testimony there are notes reflecting the frequency and length of Latesha's headaches. In 2008 Latesha reported having headaches every day lasting for at least three to four hours. (Id. at 355.) Dr. Huddleston noted in 2009 that she experienced headaches four times per week lasting for several hours. (Id. at 484.) There is also a detailed description of the migraine symptoms present in the record in the form of Latesha's testimony, which the ME did not seem to acknowledge. Because the ALJ did not address the supportability factor, he

12

apparently overlooked these shortcomings in attributing great weight to the ME's opinion.

The ALJ's explanation for prioritizing the ME's testimony is also undermined by his failure to support his characterization of the record as showing that Latesha's migraines improved with "conservative measures." (Id. at 896.) First, the ALJ did not explore with the ME at the hearing what more aggressive treatment measures he would have expected Latesha to pursue. Second, the ME did not testify that Latesha's migraines improved, nor did he characterize her treatment as conservative. More importantly, the ALJ points to only one record suggesting that medication improved Latesha's migraines, found in Dr. Huddleston's intake notes where he wrote that Imitrex "minimized" Latesha's headaches. (Id. at 893, 484.) The ALJ overlooked other records from the relevant period making clear that Latesha's migraines did not improve with treatment. For example, in November 2008 Latesha reported that her headaches were increasing in frequency despite her taking Imitrex and other pain medications. (Id. at 397-98.) In March 2009 Latesha complained of having headaches even though she was on Imitrex and other pain medications. (Id. at 473.) A year later her records reflect that she had experienced headaches for years and that her pain medications "haven't helped." (Id. at 551.) Because the ALJ failed to grapple with these records undermining his finding of improvement, his otherwise sparse explanation for giving the ME's opinion great weight lacks the support of substantial evidence. *See Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020) (noting that "highlighting facts that support a finding of non-

13

disability while ignoring evidence to the contrary" constitutes "impermissible cherry-picking").

**B.     Symptom Assessment**

Latesha also persuasively argues that the ALJ erred in assessing her statements related to her migraine symptoms. An ALJ's assessment of a claimant's symptoms is entitled to special deference and will not be overturned unless it is "patently wrong." *Burmester*, 920 F.3d at 510. That said, the ALJ must explain the symptom assessment in a way that allows the court to determine whether it was reached "in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy v. Astrue*, 759 F.3d 811, 816 (7th Cir. 2014) (quotation and citation omitted).

The ALJ here discounted Latesha's testimony that she had frequent, often debilitating migraines during the relevant period because he found that the "record shows infrequent complaints of migraine headaches, normal MRI, and good response to medications." (A.R. 892.) This explanation is unsupported for several reasons. First, with respect to Latesha's normal MRI result, the Seventh Circuit has already explained that the ALJ may not point to the MRI as evidence undermining Latesha's migraine complaints because an MRI is not used to diagnose migraines, but rather to rule out other underlying conditions that might cause a headache. (Id. at 697.) As such, the ALJ committed a serious error when he again relied on the MRI result. Moreover, as explained above, the ALJ's insistence that Latesha's migraines had a "good response" to medication rests on a cherry-picked

14

version of the evidence. The ALJ failed to address records showing that Latesha's headaches persisted despite medication.

That leaves the ALJ's statement that Latesha complained of headaches only infrequently during the relevant period. According to the ALJ, the records show that after December 2008 Latesha complained of headaches to her doctors "only twice" during the relevant period, once in February 2009 and again in August 2009. (Id. at 894.) The ALJ misstates the record. The record instead shows that in addition to the occasions the ALJ highlights, Latesha also complained of headaches to her treatment providers in March 2009 and March 2010. (Id. at 473, 551-52.) With respect to the March 2010 visit, the ALJ wrote that "there was no mention of migraines other than listed in history." (Id. at 894.) Actually, the review of systems portion of the notes from that visit reflect that Latesha had current headache complaints, and the doctor noted that she was "tired of being in pain" and that her "meds haven't helped" with respect to her overall pain complaints. (Id. at 551-52.)

Additionally, in September 2009 during a follow-up for a stress test referral, Latesha's doctor reported that her primary problem was a history of migraines. (Id. at 544-45.) If she was not suffering from migraines during that period, it is unclear why her physician would have listed her migraine history as her number one problem. Moreover, in writing that Latesha complained of headaches "only twice" after December 2008, the ALJ did not count a December 2009 note showing that Latesha stopped taking a recently prescribed medication because it gave her "bad" headaches. (Id. at 501.) The ALJ cast aside this report because according to him,

15

the fact that a new medicine gave Latesha bad headaches undermined her testimony that she was already having daily headaches. (Id. at 894.) But the ALJ did not explore whether the medication exacerbated her documented, preexisting headaches. It is also difficult to follow the ALJ's logic in rejecting Latesha's symptom allegations because he perceived that she did not complain sufficiently of headaches, while concluding that evidence showing that she complained of medication-induced headaches somehow undermines her testimony that she suffered headaches throughout the relevant period. Accordingly, the ALJ's primary explanation for discounting Latesha's description of her symptoms—that her headache complaints were infrequent during the relevant period—lacks the support of substantial evidence.

**C.     CPP and the VE's Testimony**

Because the case must be remanded for yet another reassessment of Latesha's symptom statements and RFC based on the errors described above, the court addresses Latesha's two remaining arguments only briefly. First, Latesha argues that the ALJ improperly failed to account in the RFC for what he found to be her moderate CPP limitations. In remanding the case to the ALJ, the Appeals Council specifically instructed the ALJ to explain how the RFC's limitations to simple tasks, simple work decisions, occasional changes in work settings, and occasional social interactions accounted for her moderate limitations in CPP. (A.R. 1053.) In the current decision, however, the ALJ only summarily explains that based on Latesha's moderate CPP limitations the RFC restricts her to "simple

16

tasks and simple work-related decisions with only occasional changes in the workplace setting" and that this "SVP 2 type work accommodates any deficiencies in concentrating, persisting or maintaining pace due to symptoms from depression and anxiety." (Id. at 896.) The ALJ does not explain how or why such limitations accommodate her moderate limitations in persistence or pace, nor does he consider how migraines, in addition to depression or anxiety, impact her functioning in this domain. (See id. at 888-89.) The Seventh Circuit has made clear that limiting a claimant to simple tasks does not necessarily account for moderate CPP limitations. *See, e.g., Martin*, 950 F.3d at 373-74 (collecting cases). On remand, the ALJ must provide more than a conclusory statement to explain how the RFC limitations he identifies accommodate Latesha's moderate CPP limitations.

Finally, Latesha argues that the ALJ accepted unreliable VE testimony in determining that there is a significant number of jobs she could perform in the national economy because, according to her, the VE failed to adequately explain the basis for his estimates. The government responds that Latesha waived this argument by failing to object at the hearing and by only briefly cross-examining the VE on this point. (R. 28, Def.'s Resp. at 10.) Because the ALJ will reassess the RFC on remand, additional VE testimony is likely to be required. The ALJ should bear in mind that the Seventh Circuit has expressed skepticism about the equal distribution method that the VE referenced here, (A.R. 942); *see Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020) (characterizing the equal distribution method as "a

17

flawed job-estimate methodology"), and ensure that the VE provides a reliable accounting for any estimates.

## Conclusion

For the foregoing reasons, Latesha's motion is granted and the case is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**